Susan Webber Wright, UNITED STATES DISTRICT JUDGE
On October 25, 2013, Plaintiffs Janice Young and Raymond Young (the "Youngs") filed this lawsuit against Defendant Mentor Worldwide LLC ("Mentor") in the United States District Court for the Middle District of Georgia as part of a multidistrict litigation proceeding. Following pretrial proceedings, by order entered December 13, 2016, the MLD Court transferred the case to this Court.
Now before the Court are (1) Mentor's motion to exclude certain proposed expert testimony [ECF Nos. 98, 99] and the Youngs' response in opposition [ECF No. 100] and (2) Mentor's motion to bifurcate trial [ECF Nos. 111, 112], the Youngs' response in opposition [ECF No. 119], and Mentor's reply [ECF No. 120]. After careful consideration, and for reasons that follow, Mentor's motions are granted.
I. Background
Mentor developed a suburethral sling product called ObTape Transobturator Tape ("ObTape"), designed to treat women with stress urinary incontinence. On November 17, 2003, Janice Young underwent surgical implantation of ObTape. Initially, Young's urinary incontinence improved, but within one month, it worsened. Young continued to receive treatment from Dr. John Brizzolara, a urology specialist who performed her implant surgery.
In 2006, Dr. Brizzolara discovered that Young had a urethral cutaneous fistula, which required surgical repair. During that surgery, Dr. Brizzolara encountered the ObTape he had implanted in 2003, and he removed what he believed was the entire strip. In January 2008, Young required surgery to repair a parastomal hernia, and she reported to Dr. Brizzolara that she had been experiencing bloody vaginal discharge. On February 25, 2008, in the course of performing Young's hernia repair surgery, Dr. Brizzolara discovered that some of the ObTape had eroded into Young's vagina. Dr. Brizzolara also found granulation tissue.
On October 25, 2013, Janice Young and her husband, Raymond Young, brought this product liability action against Mentor, filing the complaint directly in an multidistrict litigation proceeding ("MDL") then pending in the Middle District of Georgia. The Youngs charge that ObTape design and manufacturing defects caused Janice Young to suffer serious and permanent injuries, including chronic infections, pain, and exacerbation of urinary incontinence *768 . Raymond Young claims loss of consortium.
On December 5, 2016, the MDL Court denied Mentor's motion seeking summary judgment and asserting that the Youngs' claims were time-barred under Arkansas's three-year statute of limitations for product liability claims. The MDL Court found a jury question as to when Janice Young's cause of action accrued-that is, when Janice Young discovered or reasonably should have discovered a causal connection between her injuries and ObTape.
II. Motion to Bifurcate Trial
Federal Rule of Civil Procedure 42(b) provides that for convenience, to avoid prejudice, or when separate trials will be conducive to expedition and economy, a court may order a separate trial of any claim or issue in a case. However, separation of issues for trial is not, and should not be, routinely ordered, see Fed. R. Civ. P. 42(b) (advisory committee note), and the moving party bears the burden to show that bifurcation is warranted. See Athey v. Farmers Ins. Exch. , 234 F.3d 357, 362 (8th Cir.2000) (holding the district court did not abuse its discretion by refusing to bifurcate claims because the movant did not show prejudice).
Mentor asks the Court to bifurcate the trial in this case by holding two separate trials: a preliminary trial on the statute of limitations, and, if necessary, a second trial on the merits of the Youngs' substantive claims. Mentor believes that a preliminary trial on the statute of limitations would consume two days, but a trial on liability, which would involve the presentation of sixteen to seventeen witnesses, including causation experts, would last at least two weeks.[1] Mentor contends that resolution of the statute of limitations defense would require only a few witnesses-the Youngs and Dr. Brizzolara-and that the jury would resolve the issue with little deliberation.
The Youngs oppose bifurcation and propose that a single jury should resolve all issues at the same time, following the presentation of all evidence. The Youngs report that they have alleged fraudulent concealment and that resolution of statute of limitations issues will require the admission of evidence related to Mentor's actions to conceal the nature of ObTape.[2] Regardless of whether the Youngs are entitled to pursue a fraudulent concealment claim, Mentor's statute of limitations defense is potentially dispositive, and a preliminary trial will not consume the time and expense necessary for a trial on the merits. The Court finds that a separate, initial trial on the statute of limitations question is especially warranted in this case, as it will promote judicial economy, avoid confusion of the issues, and prevent possible undue prejudice.
III. Motion to Exclude Testimony
Mentor asks the Court to exclude proposed expert witness testimony by Dr. William Hyman and Dr. Vladimir Iakovlev, asserting that the testimony does not meet the requirements for admissibility under Rule 702 of the Federal Rules of Evidence. Rule 702 permits a witness qualified as an expert by "knowledge, skill, experience, training, or education to give his or her opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the *769 evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.
In Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993), the Supreme Court held that Rule 702 imposes a special obligation upon a trial judge to insure that the scientific or technical principles and methodology underlying expert testimony are reliable. Id., see also Kumho Tire Co., Ltd., v. Carmichael , 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999). Additionally, a trial court must determine whether proffered testimony "fits" the facts of the case; that is whether the testimony is relevant and sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. Daubert , 113 S.Ct. at 2796 (citation omitted).
William Hyman, M.D.
Dr. Hyman holds a bachelor's degree in mechanical engineering, from the Cooper Union, and masters and doctorate of science degrees in engineering mechanics from Columbia University. He has education and experience in biomedical engineering, biomaterials (artificial materials for surgical implantation), mechanics, medical device design and safety, and Food Drug Administration (FDA) regulations.
Plaintiffs plan to call Dr. Hyman to testify regarding the mechanical structure of ObTape and to offer his opinion that the design and testing of ObTape was inadequate, that the product was defective for its intended use, and that Mentor failed to warn about the significant risk of complications and adverse events from the use of the product. Mentor moves to exclude a portion of Dr. Hyman's anticipated testimony, specifically testimony regarding the adequacy of Mentor's warnings and Mentor's knowledge, intent, and state of mind.
Adequacy of Warnings. In his supplemental expert report, Dr. Hyman opines that the instructions and warnings that came with ObTape were inadequate because they failed to warn about the significant risk of erosion and the potential for chronic pain, dyspareunia, and complications that could lead to additional surgeries. Mentor argues that Dr. Hyman is unqualified to offer opinions regarding the adequacy of warnings. Based on the current record, the Court agrees. The Eighth Circuit has explained:
Whether or not a given warning is adequate depends upon the language used and the impression that it is calculated to make upon the mind of an average user of the product. Questions of display, syntax, and emphasis are involved in evaluating a warning, or set of directions, and upon those matters [experts on unrelated subjects] are not necessarily qualified to speak.
Robertson v. Norton Co. , 148 F.3d 905, 907 (8th Cir. 1998) (quoting Walton v. Sherwin-Williams Co. , 191 F.2d 277, 285-86 (8th Cir.1951) ). The record is void of information indicating that Dr. Hyman's expertise in the area of biomedical engineering and product design qualifies him to opine as to the adequacy of warnings at issue or that his opinion on this ultimate issue of fact would be helpful to the jury. Accordingly, Mentor's motion to exclude Dr. Hyman's opinion testimony as to the adequacy of warnings is granted. See Walton v. Sherwin-Williams Co. , 191 F.2d 277, 285 (8th Cir. 1951) ("The mere fact that the witnesses here were experts in their fields of botany and plant pathology does not qualify them to speak with authority on the effectiveness of a label in conveying a warning.").
*770 Knowledge, Intent, and State of Mind. In his supplemental expert report, Dr. Hyman states that "years before ObTape was discontinued in the United States, Mentor was fully aware of the unacceptably excessive rate of ... complications for this product, yet chose not to inform implanting physicians ...."[3] Elsewhere in his report, Dr. Hyman refers to Mentor's "awareness of a problem, and wanton disregard for the rights of others"[4] and "conscious disregard for future adverse consequences."[5] Mentor argues that these and similar statements that appear in Dr. Hyman's report amount to "corporate-intent and legal-conclusions" that should be excluded. The Youngs argue that Dr. Hyman's opinions do not go to corporate intent but instead relate to information available to Mentor and Mentor's actions in response to such information.
The Court finds that a jury is capable of making its own determination as to Mentor's intent, motive, or state of mind and that Dr. Hyman's opinion on those subjects does not meet the helpfulness criterion of Rule 702. See Clinton v. Mentor Worldwide LLC , No. 4:16-CV-00319 (CEJ), 2016 WL 7491861, at *11 (E.D. Mo. Dec. 30, 2016) ("The question of corporate motive, intent, knowledge or state of mind is one for the jury, not for an expert.").
Vladimir Iakovlev, M.D.
Dr. Iakovlev is an anatomical pathologist and the Director of Cytopathology at the Department of Laboratory Medicine, St. Michael's Hospital in Toronto, Canada. The Youngs have designated Dr. Iakovlev to offer opinions on general causation, and Mentor seeks to exclude the testimony, in its entirety, on grounds that the opinions are unreliable and unhelpful.
In his expert reports, Dr. Iakovlev states that his general causation opinions are based on his review of over 300 explanted mesh samples, which include hernia meshes, pelvic organ prolapse meshes, and slings used to treat urinary incontinence. Dr. Iakovlev explains that the samples were explanted from patients "for medical indications,"[6] he assessed the samples "in view of the knowledge of normal tissue and pathological processes,"[7] and he requested "all available medical records for clinico-pathological correlations."[8] Dr. Iakovlev states that the samples he examined were of various types[9] and manufactured by various companies. In deposition, he acknowledged that approximately 10 of the 300 samples he examined were ObTape samples that he had received from attorneys "in the context of medical-legal consultations."[10] Dr. Iakovlev has reported his mesh sample findings in peer-reviewed journals and scientific meetings.[11]
*771 Dr. Iakovlev's supplemental expert report contains a section titled "General Opinions Regarding Vaginal Polypropylene Mesh Implants"[12] and another titled "Specifics of ObTape Slings."[13] The general opinions section begins as follows:
The mesh acts as a foreign object, rather than a tissue component. It cannot be adapted/remodelled by the body. The body attempts to degrade and isolate the mesh while the mesh and the tissue reaction can damage the organs and anatomical structures through several mechanisms. These pathological changes occur in a critical anatomical location - the female pelvis. Although the changes occur in all patients, the severity and the accumulative effect is variable. As with other diseases, the manifestations range from subclinical to fully developed complications.[14]
As for ObTape "specifics," Dr. Iakovlev states that in the course of his research and involvement in litigation, he has examined specimens in 10 ObTape cases. He states, "In cases where an adequate history was provided[,] the complications included mesh erosion in all cases (100%). This was different from other sling types which had erosions listed as a complication in 30-40% of mesh explants." Dr. Iakovlev does not provide the number of ObTape cases that included an "adequate history." Finally, Dr. Iakovlev concludes that the cumulative effects of ObTape design features result in "higher mucosal erosion rates" and "persistent infection that cannot be cleared by the body and can spread through the deep tissues."[15]
Mentor argues that Dr. Iakovlev's opinions about non-ObTape products are irrelevant and unreliable. In deposition, Dr. Iakovlev acknowledged that his general causation opinions cover all types of polypropylene mesh products[16] and that complications from polypropylene mesh products are "somewhat different," depending on the device implanted.[17] On the other hand, Dr. Iakovlev has testified: "[I]f we want to understand what is occurring after implantation of any polypropylene mesh of variable design, we have to know all this background[,] and we have to all these studies[,] and all the knowledge which was accumulated over the years. Then we can interpret accurately case-specific material."[18] The Court finds that neither Dr. Iakovlev's explanation nor the Youngs' arguments demonstrate that information about various types of polypropylene mesh products (which according to Dr. Iakovlev, cause different types of pathological changes depending on the product) is relevant in this case, which deals with a specific mesh product, used for a specific purpose.
Dr. Iakovlev acknowledges that the general opinions contained in his report "were formulated for earlier reports for other litigations" and are "not specific for ObTape."[19] He also admits that he has no knowledge as to how the mesh explants he has examined were selected, thus there is no assurance that they were randomly selected *772 and no way of projecting the potential rate of error. After careful review, the Court cannot find that Dr. Iakovlev's proposed opinion testimony is the product of reliable principles and methods, and Mentor's motion to exclude will be granted.
IT IS THEREFORE ORDERED that Defendant's motion to exclude testimony [ECF No. 98] is GRANTED as provided in this order.
IT IS FURTHER ORDERED that Defendant's motion to bifurcate [ECF No. 111] is GRANTED. The Court will schedule trial dates by separate order.
IT IS SO ORDERED THIS 1st DAY OF MAY, 2018.

Mentor reports that the first jury trial held in a case that was part of the MDL proceeding lasted six weeks.

In a reply brief, Mentor argues that the Young's allegations fall short of the standard for fraudulent concealment and that the Youngs have abandoned a fraudulent concealment claim. The Court is unable to resolve this issue on the current record, as Mentor has not requested a ruling, and the Youngs have not been heard on the matter.

ECF No. 100-2, at 16.

Id. , at 9,

Id.

ECF No. 100-10, at 4.

Id.

Id.

ECF No. 100-10, at 2("The explanted mesh types included heavy and lightweight knitted polypropylene, multifilament, GoreTex and combined designs.").

ECF No. 98-5, at 9 (April 4, 2017 Iakovlev Dep., 91-92).

Publication "is but one element of peer review [and] is not a sine qua non of admissibility." Daubert v. Merrell Dow Pharm., Inc. , 509 U.S. 579, 593-94, 113 S.Ct. 2786, 2797, 125 L.Ed. 2d 469 (1993)"The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised." Id.

ECF No. 98-4, at 21-34.

Id., at 35-36.

Id. at 21. Dr. Iakovlev also lists "components" of his general opinions, which include descriptions of clinical symptoms such as inflammation; scar tissue; mesh contraction, folding, migration, and degradation.

ECF No. 98-4, at 36.

ECF No. 98-5, at 4 (April 4, 2017 Iakovlev Dep., 71).

ECF No. 98-5, at 5 (April 4, 2017 Iakovlev Dep., 75).

ECF No. 100, at 9 (quoting April 4, 2017 Iakovlev Dep., 265-266).

ECF No. 98-6, at 5 (May 26, 2016 Iakovlev Dep., 21).